**ADMIRAL PLASTICS CORP., Plaintiff-Appellee and Cross-Appellant,**

v.

**TRUEBLOOD, INC., Defendant-Appellant and Cross-Appellee.**

Nos. 20383, 20384.

United States Court of Appeals, Sixth Circuit.

Feb. 10, 1971.

Charles W. Slicer, Dayton, Ohio, for Trueblood, Inc.

Harry F. Jeffrey, Dayton, Ohio, for Admiral Plastics Corp.

Before WEICK, EDWARDS, and BROOKS, Circuit Judges.

WEICK, Circuit Judge.

This appeal arose out of an action for damages filed in the District Court by Admiral Plastics Corporation (Admiral) of New York against Trueblood, Inc. (Trueblood) of Dayton, Ohio, for breach of a contract in which Trueblood agreed to design and manufacture for Admiral three injection blow mold machines, at a cost of $39,750.00 per machine. Jurisdiction was based on diversity of citizenship. The case was governed by Ohio law.

The District Court, sitting without a jury, found that both parties failed to act in good faith and failed to cooperate in the performance of the contract, thus rendering the contract void. The District Court entered judgment in favor of Admiral for $29,812.50, which was the amount of its down payment to Trueblood, and dismissed Trueblood's counterclaim. Both parties appeal. We affirm.

In 1965, Admiral was a leading manufacturer and supplier of plastic containers, which were extensively used in the food, beverage and pharmaceutical industries. Admiral could not meet the ever-increasing demand for its product, and as a result, began investigating machine manufacturing companies to determine which company could best supply Admiral with the injection blow mold machines it needed to increase production. Paul Marcus, the chief engineer for Admiral, contacted Trueblood, a manufacturer of injection mold machines, and was informed that Trueblood had never built a blow mold machine, but would consider doing so if Admiral provided the specifications.

Marcus made several trips to Trueblood's plant, the last preliminary meeting being on May 17, 1966. At this meeting Marcus described the features of the machine required by Admiral and stated that it would want Trueblood to

build only the rear portion of the machine, in order to protect Admiral's trade secrets. On May 24, 1966, Marcus called Trueblood, and asked for a firm quotation on the price of the machine. Trueblood quoted $39,750.00 per machine, and Marcus ordered three machines to be manufactured by Trueblood. Marcus stated that the written purchase order, the specifications, and a check for 25% of the total purchase price would be forthcoming.

By June 22, 1966, Trueblood had not received the purchase order, specification letter, or check from Admiral. Trueblood advised Marcus of this fact, and on June 28, Marcus informed Trueblood that the purchase order had been written, but would not be sent until the middle of July, at the end of Admiral's fiscal year. Thereafter, on July 20, 1966, Trueblood received from Admiral a check for $29,812.50, a six-page specification letter dated May 24, 1966, and the purchase order.

The specification letter stated that Trueblood would redesign (where necessary), manufacture, assemble and test three injection blow molding machines and furnish all engineering drawings of the machine and that the delivery dates for the machines were November 1, November 15, and December 1, 1966. On July 21, 1966, Trueblood informed Admiral that there were discrepancies between the specification letter and the previous discussions with Marcus. After being assured that the specifications would be revised, Trueblood deposited Admiral's check of $29,812.50, but did not sign the purchase order.

On August 25, 1966, Marcus visited Trueblood's plant, and expressed concern over the lack of progress in the construction of the machines, and the fact that Trueblood had not forwarded the design drawings. Marcus was informed that the component parts had been ordered, and also that Trueblood had not received the revised specifications.

Marcus revised the specifications upon his return to New York, and Trueblood received them on September 9, 1966. These revised specifications satisfied Trueblood, except for the terms of payment, and the fact that Trueblood considered the data on the machine's automatic sequence of operation to be inadequate.

On October 19, 1966, an engineer of Admiral visited Trueblood's plant, and discovered that little work had been done on the manufacture of the machines. Only one of the three machines ordered was in any stage of construction, and only to the extent of the basic weldment.

On October 26, 1966, Marcus informed Trueblood that one of the component parts ordered by Trueblood, the Egan reciproscrew, was the wrong size, and that a larger one was required. Trueblood told Marcus that to reorder the part would entail added expense. Marcus instructed Trueblood to order the larger reciproscrew, and that Admiral would bear the added expense.

No design drawings of the machines were furnished to Admiral as of November, 1966. On November 11, 1966, a Trueblood official visited Admiral's plant, to observe Admiral's machines in operation, in order to aid Trueblood in the making of the design drawings. However, no drawings were ever furnished to Admiral.

On December 1, 1966, the Admiral engineer again visited Trueblood's plant, and again observed little progress on the construction of the machines. He was informed that the earliest possible delivery date would be March 1, 1967. Thereafter, on December 8, 1966, Admiral's attorney contacted Trueblood, asserting that Trueblood was in default, and threatened legal action unless Trueblood signed the purchase order. At this same time, Trueblood ceased work on the drawings and on the machines. No machine was ever delivered

to Admiral, and Trueblood did not return the $29,812.50 down payment.[1] Both parties claimed substantial damages as the result of the other's alleged lack of performance and breach of contract.

■ The District Court held that Admiral and Trueblood entered into a valid contract, under Ohio Rev.Code § 1302.07 (U.C.C. 2–204):

(A) A contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract.

(B) An agreement sufficient to constitute a contract for sale may be found even though the moment of its making is undetermined.

(C) Even though one or more terms are left open a contract for sale does not fail for indefiniteness if the parties have intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy.

With this there can be no dispute. The District Court recognized that the contract was one for the manufacture and sale of unique machines, in the designing of which neither company had any experience. It was understandable therefore, that certain terms were left unspecified and that difficulty was encountered in designing and producing the machines. This in no way detracts from the validity of the contract.

■ The nature of the contract made it imperative that both parties cooperate to the fullest extent in order for the machines to be successfully designed and built. The U.C.C. recognizes such situations where good faith and cooperation are necessary to the successful fulfillment of a contract. Ohio Rev.Code §§ 1301.09 and 1302.24 (U.C.C. 1–203 and 2–311). The District Court determined that both parties failed to act in good faith and failed to cooperate in the performance of the contract, thus terminating their respective obligations and rendering the contract void.

Each party has urged that whatever its shortcomings were, they were caused by the other party's initial failure to cooperate and subsequent breach of contract. The District Court found that lack of progress on the machines could not be attributed to the conduct of any one party to the contract, and we agree. There was evidence that Admiral was delinquent in furnishing the specifications, as was Trueblood in failing to furnish the machine design drawings.

■ The evidence is not clear as to who was at fault for ordering the wrong size Egan reciproscrew, but a resolution of this is not necessary, as both parties were sufficiently at fault in other instances which justify the finding of mutual breaching of the contract. In our opinion, the findings of fact adopted by the District Court are supported by substantial evidence and are not clearly erroneous. The District Court was correct in dismissing Trueblood's counterclaim for damages against Admiral, and in not awarding to Admiral any money damages other than the return of its down payment.

The only question remaining is whether the District Court was correct in ordering the refund of Admiral's down payment of $29,812.50. We think it was.

The U.C.C. does not provide a remedy for the specific situation of a mutual

---

1. The difficulty of performing this contract for the custom-made machines is exemplified by the fact that Admiral hired, on November 7, 1966, one Ephraim Natkins as chief engineer, and on January 21, 1967, one Eli Jaffe as engineer. Both men worked almost exclusively on designing the injection blow mold machines that were finally manufactured and delivered by a Connecticut company, between September, 1967 and January, 1968.

breaching of a contract.[2] We must therefore turn to other state principles of law and equity. Ohio Rev.Code § 1301.03 (U.C.C. 1–103).

The rule in Ohio is: "Mutual delinquency gives rise to the presumption of mutual assent to a rescission." Hallet & Davis Piano Co. v. Starr Piano Co., 85 Ohio St. 196, 203, 97 N.E. 377, 378 (1911), quoting from Mowry v. Kirk, 19 Ohio St. 375, 383 (1869). *See also* 11 Ohio Jur.2d Contracts, § 293, citing Dickson v. Wolin, 18 Ohio Law Abst. 107 (1934), and Rogers v. Simpson, 11 Ohio Cir.Ct.R., N.S., 561, 31 Ohio Cir. Ct.R. 103 (1908); Restatement of Contracts § 406, comment b.

We construe the parties' actions in this case, illustrated by their failure to cooperate and failure to perform tasks called for by the contract within a reasonable time, as evidence of a mutual rescission. Under Ohio law, in such a situation, a party is entitled to a refund of any down payment he may have made. In 11 O.Jur.2d Contracts § 301, citing Rogers v. Simpson, *supra*, it is stated that "A party is entitled to recover what he has paid upon the mutual rescission of a contract resulting from the inability of both parties thereto to perform." In Brown v. Johnston, 95 Ohio App. 136, 108 N.E.2d 298 (1952), a contract was mutually rescinded, and the purchaser was allowed to recover the money that he had paid on the purchase price, in excess of the benefits conferred upon him while the contract was in existence. Since Admiral received no benefits from Trueblood during the existence of the contract, it is entitled to the return of its down payment.

The judgment is affirmed in each appeal. Costs will be assessed against each appellant.

---

2. In our opinion Ohio Rev.Code § 1302.-92 (U.C.C. 2–718) is not applicable to this case. The section bears some resemblance, in that it pertains to a buyer's right to restitution of his payments on the contract. However, the section specifically applies when "the seller justifiably withholds delivery of goods because of the buyer's breach." That is not the case here.